IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| C.O.P. COAL DEVELOPMENT COMPANY and STANDARD INDUSTRIES,<br><br>    Appellants,<br><br><br><br>       v.<br><br>KENNETH A. RUSHTON, Trustee, et al.,<br><br>    Appellees. | MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS APPEAL AS MOOT AND INTERLOCUTORY<br><br><br>Case No. 2:10-CV-269 TS |

This matter is before the Court on appellee Kenneth A. Rushton, Chapter 7 Trustee of the

Estate of C.W. Mining Company ("Trustee"), and Interested Parties Rhino Energy LLC

("Rhino") and Castle Valley Mining LLC's ("Castle Valley") (collectively referred to hereinafter

as "Movants"), Joint Motion for Dismissal of Appeal as Moot and Interlocutory.[1]  For the

reasons discussed more fully below, the Court will grant the Motion.

---

[1]Docket No. 15.

## I.  BACKGROUND

This dispute arises out of the involuntary Chapter 7 bankruptcy proceedings of C.W.

Mining Company ("CWM").  Before entering bankruptcy, CWM was in the business of mining

coal.  CWM's primary asset was an underground coal mine located in Emery County, Utah—the

Bear Canyon mine.  The Bear Canyon Mine is located on property owned by Plaintiff C.O.P.

Coal Development Company ("COP").

In March of 1997, COP and CWM entered into a coal mining agreement (the "COP

Agreement").  Pursuant to the COP Agreement, COP granted CWM the right to "operate and

control" the Bear Canyon mine for purposes reasonably incidental to mining.  Paragraph 5 of the

COP Agreement—referred to as the "Continuous Operations Clause"—gave specific instruction

on the operation of the mine.  That section states, in pertinent part:

> Operator (CWM) shall diligently and continuously operate the subject property for
> the term hereof unless the operation thereof prevented by strike, car shortages,
> government regulation, any act of God, or similar cause beyond the control of
> Operator, or unless all of the merchantable coal in said premises is sooner
> extracted, mined and removed.  Operator shall conduct all operations hereunder in
> a good and minerlike manner and in a manner which will result in the ultimate
> maximum economic recovery of coal from the property.[2]

During the pendency of the underlying bankruptcy case, COP asserted that defaults

occurred under the COP Agreement.  On this basis, COP attempted to terminate the COP

Agreement and enter into a new mining agreement with a separate party.  The Trustee then

commenced Adversary Proceeding No. 09-02248 against COP to determine the meaning of the

---

[2]Docket No. 26 Ex. 1, at 40.

phrase "diligently and continuously operate" and to recover damages for violations of the automatic stay.

On December 10, 2009, the bankruptcy court entered its "Order and Judgment on Trustee's Objection to [COP]'s Proof of Claim No. 9, Proof of Claim No. 26 and Trustee's First, Third, and Fourth Claims for Relief Against [COP] in Adversary Proceeding No. 09-2448" (the "Cure Claim Order").[3]  Pursuant to the Cure Claim Order, the bankruptcy court awarded COP $1,320,930.89 as the amount required to cure CWM's defaults under the COP Agreement.

The bankruptcy court entered its "Order and Judgment Arising from Trial on November 16, 17, 23, and 24, 2009" on February 12, 2010 (the "February 2010 Order").[4]  Pursuant to the February 2010 Order, the bankruptcy court granted the Trustee's sixth claim for relief and found that COP violated the automatic stay.  The bankruptcy court held:

> it is hereby ORDERED, ADJUDGED AND DECREED as follows: COP remains in willful violation of the automatic stay and in contempt of orders of this Court . . . which have caused damages to this estate, including but not limited to, any amounts paid or payable by this estate to MMS for delinquent royalties (based on coal mined while the mine has been in possession of Hiawatha), and the same may be offset against COP's cure claim.[5]

In the February 2010 Order, the bankruptcy court also held that CWM was not in default under the COP Agreement.  The bankruptcy court determined that the "Continuous Operations Clause" of the COP Agreement required only that CWM comply with state and local law and mine in accordance with the continuous operations standards required by the Bureau of Land

---

[3]*Id.* Ex. 4.

[4]*Id.* Ex. 5.

[5]Docket No. 17 Ex. 1, at 5.

3

Management ("BLM").  The continuous operations standards of the BLM require only that CWM mine at least 1% of the estimated recoverable coal reserves each year on a three-year rolling average.  In the February 2010 Order the bankruptcy court expressly found that CWM was in full compliance with the obligations imposed on it under the Continuous Operations Clause.

Subsequently, the Trustee reached an agreement to sell the majority of CWM's mining assets—including the Bear Canyon mine—to Rhino for $15 million.  On August 4, 2010, the bankruptcy court entered a sale order (the "Sale Order") approving the sale of CWM's mining assets to Rhino.  As part of the Sale Order, the bankruptcy court specifically adopted and incorporated the findings of fact and conclusions of law relating to the Continuous Operations Clause, as found in the February 2010 Order.[6]  The Sale Order expressly found that Rhino was a good faith purchaser and provided that:

> If, in the absence of any person or entity obtaining a stay pending appeal, the Debtor and the Buyer close under the Sale Agreement, the Buyer shall be deemed to be acting in "good faith" and shall be entitled to the protection of § 363(m) of the Bankruptcy Code as to all aspects of the transaction under and pursuant to the Sale Agreement if this Order or any authorization contained herein is reversed or modified on appeal.[7]

Pursuant to its terms, the Sale Order closed on August 25, 2010.  At the closing Rhino paid the purchase price to the Trustee, and the Trustee conveyed the mine assets to Castle Valley, Rhino's wholly owned subsidiary.  COP did not object to, or seek to stay, the closing of the Sale

---

[6]*See id*. Ex. 4, at 17.

[7]*Id*. Ex. 3, at 29-30.

Order.  Since the closing, Rhino and Castle Valley have expended substantial sums of money and time in reliance on the conveyance they received through the Sale Order.

COP raises two issues on appeal: (1) whether the bankruptcy court erred in determining that COP violated the automatic stay and incorrectly awarded damages and offset based on that alleged violation; and (2) whether the bankruptcy court erred in its interpretation of the Continuous Operations Clause found in the COP Agreement.

## II.  DISCUSSION

Movants seek dismissal of this appeal on the grounds that: (1) COP's automatic stay claims are not ripe for determination and are, therefore, interlocutory; and (2) COP's claims regarding the interpretation of the Continuous Operations Clause are moot pursuant to 11 U.S.C. § 363(m) and the doctrine of equitable mootness.

## A.    AUTOMATIC STAY

COP appeals the bankruptcy court's holding in the February 2010 Order that COP violated the automatic stay and allowing offset against COP's cure claim.  Movants assert that this claim is unripe and procedurally defective because the bankruptcy court did not determine or award any specific damages and, therefore, did not issue a final order on the Trustee's sixth claim for relief.

Pursuant to 28 U.S.C. § 158(a):

The district courts of the United States shall have jurisdiction to hear appeals
(1) from final judgments, orders, and decrees;
. . .
(3) with leave of the court, from other interlocutory orders and decrees;
and, with leave of the court, from interlocutory orders and decrees, of bankruptcy
judges entered in cases and proceedings referred to the bankruptcy judges under

5

section 157 of this title.  An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

COP cites to a recent opinion in a related matter—*Standard Industries Inc. v. Aquila, Inc. (In re C.W. Mining Co.)*[8]—for the proposition that this appeal is a final order for purposes of § 158(1).  COP's reliance on *Standard Industries* is misplaced.  In that case, the court indicated that "[n]ot all civil contempt orders are final appealable orders."[9]  Nevertheless, the court found the contempt order in that case was a final order because

> the Tenth Circuit has held that when "there is no ongoing underlying action other than the general bankruptcy proceedings," and a "finding of contempt has been made and a sanction imposed, an order has acquired all the elements of operativeness and consequence necessary to be possessed by any judicial order to enable it to have the status of a final decision."[10]

This case is readily distinguishable from *Standard Industries.*  Here, COP is appealing an order entered in an adversary proceeding separate from the underlying bankruptcy case.  Furthermore, in the February 2010 Order the bankruptcy court indicated that "COP remains in willful violation of the automatic stay and in contempt of orders of this Court . . . which have caused damages to this estate . . . and the same may be offset against COP's cure claim."[11]  And "[a]dditional damages may be awarded to the Trustee and this estate against COP, Standard, Hiawatha, and others as previously stipulated by the parties . . . as further proceedings in

---

[8]431 B.R. 307, 2009 WL 5175673 (10th Cir. BAP 2009) (unpublished).

[9]*Id*. at *3 (internal citations omitted).

[10]*Id*. (quoting *In re Steele Cattle, Inc.*, 39 F.3d 1192, 1994 WL 596627 at *1 (10th Cir. 1994) (unpublished) and *O'Connor v. Midwest Pipe Fabrications, Inc*., 972 F.2d 1204, 1208 (10th Cir. 1992)).

[11]Docket No. 26 Ex. 2, at 5.

Adversary Proceedings No. 09-02375 warrant."[12]  Thus, the February 2010 Order left open the amount of sanctions to be awarded for COP's violations, pending the completion of other adversary proceedings.

This case is also distinct from *Standard Industries* because the contempt order in that case expressly provided that: "[t]his order is final as to the matters ruled upon, this Court having determined that there is no just reason to delay the entry and enforcement of this order," and included a briefing schedule for a determination of the amount and reasonableness of the fees to be awarded as a sanction.[13]  The February 2010 Order contains no such language.

Upon review of the relevant case law, the Court is persuaded that the appropriate rule of law to be applied to the instant motion is that a "bankruptcy court's order imposing sanctions is a final order subject to appeal under 28 U.S.C. § 158(a)(1)"[14] where the sanctions to be awarded have been quantified or only a ministerial computation is required.[15]  Because the February 2010 Order does not quantify the amount of damages to be awarded and more than ministerial computation is required, the Court finds that the February 2010 Order is not a final order subject

_____

[12]*Id.*

[13]*Standard Industries*, 431 B.R. at *2 n.11.

[14]*Armstrong v. Rushton (In re Armstrong)*, 304 B.R. 432, 434-35 (10th Cir. BAP 2004) (citing *Mountain Am. Credit Union v. Skinner (In re Skinner)*, 917 F.2d 444, 446 (10th Cir. 1990) (per curiam)).

[15]*See In re Montgomery*, 224 F.3d 1193 (10th Cir. 2000).

to appeal under § 158(a)(1).  This holding is supported by the reasoning of courts from other jurisdictions that have considered this same issue.[16]

A determination that the February 2010 Order is not a final order for purposes of COP's automatic stay and offset appeal does not lay this issue to rest.  In the event the February 2010 Order is interlocutory, COP requests leave to appeal under Bankruptcy Rule 8003(c).

> That rule permits the district court to construe an improperly filed notice of appeal as a request for leave to appeal.  In considering such a request, courts apply the test for interlocutory appeals to the circuit courts set forth in 28 U.S.C. § 1292(b). Thus, leave to appeal will be granted when the order appealed from "involves a controlling question of law as to which there is substantial ground for difference of opinion and . . . an immediate appeal from the order may materially advance the ultimate termination of the litigation."[17]

COP has the burden to show it has met these requirements.[18]

In the instant action, COP has provided no argument demonstrating that its appeal of the bankruptcy court's holding as to the automatic stay claim and offset involve any controlling questions of law as to which there are substantial differences of opinion.  Indeed, review of the February 2010 Order leads the Court to believe that the bankruptcy court's holdings with regard

---

[16]*E.g. Kyung Sook Kim v. Kotoshirodo (In re Kyung Sook Kim)*, 433 B.R. 763, 775-77 (D. Haw. 2010) (holding that because the subject memorandum "did not determine the amount of sanctions, it did not fully end the sanctions dispute, much less indicate the bankruptcy court's intention that the [memorandum] be its final act on the matter" and reasoning that "construing the [memorandum] as a final order would lead to a ridiculous result of the bankruptcy court being divested of jurisdiction to determine the amount of sanctions").

[17]*Twenver, Inc. v. MCA Television, LTD (In re Twenver)*, 127 B.R. 467, 470 (D. Colo. 1991) (quoting *Whirlpool Leasing Servs., Inc. v. Nucor, Inc. (In re Nucor, Inc.)*, 116 B.R. 246, 247 (D. Colo. 1990)).

[18]*Id.* (citing *Robinson v. Silverman (In re Johns–Manville Corp.)*, 47 B.R. 957, 960 (S.D.N.Y. 1985); *Richmond v. Peterson (In re Peterson)*, 12 B.R. 961, 962 (D. Colo. 1981)).

to the automatic stay and offset are the result of the particular facts of this case being applied to settled law.

Moreover, the Court is not convinced that an immediate appeal of the automatic stay and offset sections of the February 2010 Order may materially advance the ultimate termination of the litigation. As discussed previously, the bankruptcy court left open the amount of sanctions to be awarded for COP's on-going automatic stay violations. Thus, there is no certainty as to what damages, if any, will actually be offset against the cure claim. These issues should first be determined by the bankruptcy court before review by this Court. For these reasons, the Court will decline to grant COP leave to appeal in an interlocutory fashion under Bankruptcy Rule 8003(c).

In sum, the Court finds that (1) the bankruptcy court's holdings with regard to violations of the automatic stay and award of offset against COP's cure claim—as found in the February 2010 Order—are not final for purposes of § 158(a)(1); and (2) will decline to grant COP leave to file an interlocutory appeal pursuant to Bankruptcy Rule 8003(c) and § 158(a)(3). The Court will therefore dismiss COP's automatic stay and offset claims as unripe and interlocutory.

B.    CONTINUOUS OPERATIONS CLAUSE

1.    11 U.S.C. § 363(m)

Subsection 363(m) provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

Here, COP does not dispute that Rhino is a good faith purchaser.  It is also undisputed that COP did not seek to stay the Sale Order.  Thus, "[t]he mootness question turns on what relief is available to [COP] if it were to prevail in this appeal."[19]  "[Section] 363(m) forecloses any remedy . . . that would affect the validity of the trustee's sale.  But it does not preclude a remedy that would not affect the validity of the sale."[20]  Furthermore, "[t]he burden of showing mootness is on the trustee, which here means showing that [COP] would not have such a remedy."[21]

Movants assert that the relief COP seeks with regards to the Continuous Operations Clause would affect the validity of the Sale Order in contravention of § 363(m).  According to Movants, "by asking this Court to change the interpretation of the Continuous Operations Clause after the sale has closed" COP impermissibly seeks to change the terms of the sale to Rhino.[22]

Movants cite to *In re Stadium Management Corp.*[23] in support of their argument that the relief sought in this appeal is prohibited by § 363(m).  In that case, the bankruptcy court authorized the sale of a professional football stadium, along with the assumption and assignment

---

[19]*C.O.P. Coal Dev. Co. v. C.W. Mining Co. (In re C.W. Mining Co.)*, 641 F.3d 1235, 1239 (10th Cir. 2011) (citing *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992) (noting that an appeal should be dismissed as moot if it is "impossible for the court to grant any effectual relief whatever") and *Osborn v. Durant Bank & Trust Co. (In re Osborn)*, 24 F.3d 1199, 1203 (10th Cir. 1994) (holding "that because it is not impossible for the court to grant some measure of effective relief, the Osborns' appeal is not moot")).

[20]*Id.*

[21]*Id.*

[22]Docket No. 16, at 18.

[23]*Anheuser-Busch, Inc. v. Miller (In re Stadium Mgmt. Corp.)*, 895 F.2d 845 (1st Cir. 1990).

10

of a sublease between the debtor and the New England Patriots for the use of the stadium.[24]  No

stay of the sale was obtained and the sale was completed, including the assumption of the

sublease.[25]  Recognizing that the sale of the stadium itself could not be reversed, the Patriots

sought to reverse the bankruptcy court's order granting the motion to assign their sublease—the

Patriots objected to the bankruptcy court's interpretation of the sublease and argued that the

debtor was in default thereunder.[26]

On appeal, the First Circuit noted that "[t]he sublease is one of the most valuable

elements of the sale" and "without the sublease [the purchaser] would not have submitted the

same bid for the Stadium."[27]  The *Stadium* court reasoned that:

> Given the importance of the sublease to the sale of the stadium, the assumption
> and assignment of the sublease was integral to the restructuring of debtor-creditor
> relations.  It was thus within the bankruptcy court's power to determine the claims
> of the parties with respect to the sublease so that a prospective purchaser would
> know what he was getting.  This increased the value of the stadium and benefits
> all creditors.  Thus, the assignment of the sublease was integral to the sale and
> removing it from the sale would have adversely affected the terms of the sale.[28]

The *Stadium* court rejected the Patriots' argument that the relief sought would not unravel

the sale because the purchaser had the "right to terminate its bid if significant adjustments were

---

[24]*Id*. at 846.

[25]*Id*.

[26]*Id*. at 846-47.

[27]*Id*. at 849.

[28]*Id*.

made in what it was purchasing."[29]  The court noted that "[i]t is axiomatic that 'one cannot challenge a central theme of a purchase without challenging the validity of the sale itself'" and held that "because appellants failed to request a stay pending appeal" it was "powerless to undo the sale."[30]

The Court finds *Stadium* particularly on point.  In the instant appeal, COP seeks to change the terms of the sale to Rhino by objecting to the bankruptcy court's interpretation of the COP Agreement.  Similar to the Patriots, COP argues that § 363(m) has no bearing on this appeal because COP is not appealing the Sale Order itself; rather, "it merely takes issue with why the bankruptcy court even undertook interpretation of the Continuous Operations Clause in the first place . . . and . . .  seeks a different interpretation of the clause going forward."[31]  As in *Stadium*, the Court "think[s] that the appellants have construed both the scope of the bankruptcy judge's power and the scope of the sale too narrowly."[32]  Additionally, the Court would note that COP formulates a specious distinction as the Sale Order expressly adopted and incorporated the findings of fact and conclusions of law relating to the Continuous Operations Clause, as found in the February 2010 Order.[33]

---

[29]*Id.*

[30]*Id.*

[31]Docket No. 26, at 10.

[32]*Stadium*, 895 F.2d at 847.

[33]In a related argument, COP asserts that no case or controversy existed as to the Continuous Operations Clause because COP was not claiming a default based on that part of the COP Agreement.  According to COP, the "bankruptcy court has no business even addressing the issue, let alone formulating a definition for terms that were not in dispute."  Docket No. 26, at 18.

Here, the COP Agreement provides Rhino the right to mine the Bear Canyon mine.  Thus, the COP Agreement provides rights to the most valuable asset conveyed through the Sale Order.  The bankruptcy court's interpretation of the Continuous Operations Clause therefore increased the value of CWM's mining estate and benefitted all creditors.  The assignment of the COP Agreement was integral to the sale and removing it from the sale would adversely affect the terms of the sale.  Furthermore, pursuant to the Sale Order, Rhino had the right to terminate its bid if significant adjustments were made in what it was purchasing.  Given these similarities, the Court finds the reasoning of *Stadium* highly persuasive.

Nevertheless, COP contends that its appeal of the Continuous Operations Clause is not barred by § 363(m) because it is simply attempting to define the contours of the COP Agreement and establish the correct interpretation of those terms as the parties move forward.  According to COP, the relief it seeks in this appeal is allowed under the reasoning of *Yellow Cab Cooperative Ass'n v. Colorado Public Utilities Commission*.[34]

In *Yellow Cab*, the Court addressed the appeal by a regulatory agency of the bankruptcy court's injunction preventing the agency from issuing a pending decision that would affect the property of the debtor's estate.[35]  The court held that the appeal was not moot in spite of

---

This argument is similarly unavailing.  The bankruptcy court specifically held that a case and controversy existed for it to interpret the Continuous Operations Clause.  In reaching this holding, the bankruptcy court noted that COP previously claimed defaults occurred under the COP Agreement and the Trustee was required to provide "adequate assurance of future performance" under 11 U.S.C. § 365(b)(1)(C) as a prerequisite to assuming the COP Agreement.  *See* Docket No. 17 Ex. 2, at 3-4.

[34]194 B.R. 504 (D. Colo. 1996).

[35]*Id*. at 506.

13

appellant's failure to obtain a stay of the sale order because appellant sought neither to undo the sale nor to challenge the bankruptcy court's finding.[36]  "Instead, [appellant] challenge[d] the court's authority under § 362(a)(3) to enjoin it from exercising its regulatory authority."[37]  The *Yellow Cab* court's decision turned on the issue of whether the appellant agency "was authorized during the pendency of the automatic stay to exercise its regulatory power over the parties."[38]

Here, COP is not an agency claiming that the bankruptcy court impugned its authority to regulate.  Rather, COP is an interested party, seeking, in a dilatory fashion, to change the terms of an agreement it is now contractually obligated to fulfill with Rhino.  Furthermore, the agreement COP seeks to modify—the COP Agreement—is intimately related to the final sale as memorialized in the Sale Order.  The Court, therefore, finds *Yellow Cab* inapplicable to the facts of this case.

COP's assertion—that it is simply attempting to define the contours of the COP Agreement and establish the correct interpretation of those terms as the parties move forward—is disingenuous.  In addressing COP's arguments as to the Continuous Operations Clause, the bankruptcy court held that "[e]ssentially, COP and ANR argue that the Continuous Operations Clause is subject to the whim and caprice of those entities."[39]  The bankruptcy court noted that "[t]here is simply no way for an independent contractor . . . to be able to know whether or not it

---

[36]*Id*. at 508.

[37]*Id*.

[38]*Id*.

[39]Docket No. 17, at 7.

is complying with the Continuous Operations Clause under such a 'standard.'"[40]  In sum, COP

seeks an interpretation of the Continuous Operations Clause of the COP Agreement that provides

it with unfettered discretion to allege a default.  The Court finds such relief would adversely

affect the sale of assets to Rhino and, thus, the validity of that sale.

In a different vein, COP argues that it may be able to recover monetary relief from the

proceeds of the sale to Rhino.  The Tenth Circuit has recognized that  "'where state law or the

Bankruptcy Code provides remedies that do not affect the validity of the sale, § 363(m) does not

moot the appeal.'"[41]  COP may seek damages against the proceeds of the sale without violating

the Sale Order.  Such relief, however, is only available "in the absence of a stay, when the

proceeds of the sale have not been commingled with the rest of the bankruptcy estate's funds."[42]

Here, the Trustee has provided evidence that, following the closing of the sale,

$2,145,329.05 of the proceeds of the sale were set aside pursuant to the Sale Order for

"obligations owed by [CWM]."[43]  However, COP has alleged no remedy that would allow it to

recover against the proceeds of the sale to Rhino or the set aside based on the alleged

misinterpretation of the Continuous Operations Clause.  Indeed, COP asserts that it "seeks only

to reverse the bankruptcy court's interpretation of the 'diligent and continuous operations' clause

---

[40]*Id.*

[41]*C.O.P. Coal*, 641 F.3d at 1239 (10th Cir. 2011) (quoting *Osborn*, 24 F.3d at 1204).

[42]*Freightliner v. Cent. Refrigerated Serv. (In re Simon Transp. Servs.)*, 138 F. App'x 52, 56 (10th Cir. June 2, 2005) (unpublished).

[43]*See* Docket No. 12 Ex. 14, at 2.

for future purposes and not for retroactive application."[44]   It is unclear to the Court how COP could allege a claim against the proceeds of the sale to Rhino based upon the future interpretation and application of the Continuous Operations Clause.

For the foregoing reasons, the Court finds COP's arguments that the relief it seeks will not affect the validity of the Sale Order to be without merit.   Thus, the Court finds Movants have met their burden on this factor.   In sum, because 1) COP did not seek to stay the Sale Order, 2) Rhino qualifies as a good faith purchaser, and 3) the relief COP seeks would affect the validity of the Sale Order, this appeal is moot under § 363(m).

2.      EQUITABLE MOOTNESS

As an alternative ground for granting the instant Motion, the Court will consider whether COP's appeal of the Continuous Operations Clause is moot under the doctrine of equitable mootness.   In a recent decision in a related matter, the Court addressed the issue of whether the doctrine of equitable mootness should apply in the Chapter 7 context.[45]   For the same reasons provided in that case, the Court will apply the doctrine of equitable mootness to this appeal.

"The equitable mootness doctrine allows a court to decline to hear a bankruptcy appeal, even when relief could be granted, if implementing the relief would be inequitable."[46]   The Tenth

---

[44]Docket No. 26, at 18.

[45]*See ANR Co., Inc. v. Rushton*, No. 2:10-CV-79 (D. Utah May 2, 2012).

[46]*C.O.P. Coal*, 641 F.3d at 1239-40 (internal citation omitted).

16

Circuit formally adopted the doctrine of equitable mootness in *In re Paige*.[47]  In *Paige*, the court

set out the following six-part test for determining whether an appeal is equitably moot:

> (1) Has the appellant sought and/or obtained a stay pending appeal? (2) Has the
> appealed plan been substantially consummated? (3) Will the rights of innocent
> third parties be adversely affected by reversal of the confirmed plan? (4) Will the
> public-policy need for reliance on the confirmed bankruptcy plan—and the need
> for creditors generally to be able to rely on bankruptcy court decisions—be
> undermined by reversal of the plan? (5) If appellant's challenge were upheld, what
> would be the likely impact upon a successful reorganization of the debtor?  And
> (6) based upon a quick look at the merits of appellant's challenge to the plan, is
> appellant's challenge legally meritorious or equitably compelling?  These six
> factors are not necessarily conclusive, nor will each factor always merit equal
> weight.[48]

The Court will address each of the six factors in turn.

a.    STAY

"The first question in an equitable mootness inquiry is whether the appellant
secured a stay to prevent execution of the reorganization plan."  This inquiry
really involves two questions: (1) Did the party seeking reversal try to obtain a
stay? (2) Assuming the party seeking reversal sought a stay, was that party
successful in obtaining a stay pending appeal?[49]

The Tenth Circuit has instructed that "both of these questions are significant."[50]  "On the one

hand, an appellant's complete and unjustified failure to seek a stay will often make it unfair for

---

[47]584 F.3d 1327 (10th Cir. 2009).

[48]*Id*. at 1337-39.

[49]*Id*. at 1341 (quoting *United States ex rel. FCC v. GWI PCS 1 Inc. (In re GWI PCS 1 Inc*.), 230 F.3d 788, 800 (5th Cir. 2000)).

[50]*Id*.

17

the court to grant relief—especially if that relief may affect third parties."[51]  "On the other hand,

[the Court] will be more inclined to accommodate an appellant who has diligently but

unsuccessfully pursued a stay pending appeal, even if awarding him relief may adversely affect

third parties."[52]  "Thus, [the Court] will not only look to whether a stay has been obtained; [but]

will also inquire into whether the appellant has sought a stay pending appeal."[53]

 Here, it is undisputed that COP did not seek a stay of either the Sale Order or, indeed, of

any order of the bankruptcy court giving rise to this appeal.  Because COP failed to take any

action in this regard, this factor weighs in favor of finding this appeal equitably moot.

  b. SUBSTANTIAL CONSUMMATION

 "The second consideration in the mootness inquiry is whether the reorganization plan has

been substantially consummated."[54]  "In determining whether a plan has been substantially

consummated, [the Court will] apply the Bankruptcy Code's three-part definition."[55]

---

[51]*Id.* (citing *Trone v. Roberts Farm, Inc. (In re Roberts Farms, Inc.)*, 652 F.2d 793, 798 (9th Cir. 1981) ("An entirely separate and independent ground for dismissal has also been established because Appellants have failed and neglected diligently to pursue their available remedies to obtain a stay of the objectionable orders of the Bankruptcy Court and have permitted such a comprehensive change of circumstances to occur as to render it inequitable for this court to consider the merits of the appeal.")).

[52]*Id.* (citing *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 144 (2d Cir. 2005) (stating that "[w]e insist that a party seek a stay even if it may seem highly unlikely that the bankruptcy court will issue one")).

[53]*Id.*

[54]*Id.*

[55]*Sutton v. Weinman (In re Centrix Fin. LLC)*, 394 F. App'x 485, 487 (10th Cir. 2010) (unpublished).

The Bankruptcy Code defines "substantial consummation" of a reorganization plan as:
"(A) transfer of all or substantially all of the property proposed by the plan to be transferred;
(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
(C) commencement of distribution under the plan."[56]

The very nature of a sale order in a liquidation proceeding contemplates such actions provided in the Bankruptcy Code's definition of "substantial consummation."  Once a sale order becomes effective, it is contemplated that there will be a transfer of all or substantially all of the property and a commencement of distribution.  Unlike the majority of reorganization plans, the assets are not restructured; rather, they are liquidated.

In this case, CWM's assets were conveyed to Rhino in exchange for $15,000,000.  Movants assert that this transaction has been substantially consummated because: "Payments have been made, possession and control of highly regulated properties have been assumed, millions of dollars of equipment and repairs have been ordered, people have been hired, and extensive work has already gone into preparing to mine coal."[57]  COP does not dispute that the transaction has been substantially consummated.

Based on the foregoing, the Court finds that this factor weighs in favor of finding this appeal equitably moot.

---

[56]*Paige*, 584 F.3d at 1341-42 (quoting 11 U.S.C. § 1101(2)).

[57]Docket No. 16, at 23 (citing Docket No. 17 Exs. 5, 10).

c.      EFFECT ON THIRD-PARTIES

"The effects that reversal will have on non-party creditors is probably the foremost

concern in [the Court's] analysis of equitable mootness."[58]

As discussed above, the bankruptcy court's interpretation of the Continuous Operations

Clause increased the value of CWM's mining estate and benefitted all creditors because it

ensured the transfer of the most valuable asset conveyed through the Sale Order.  Thus, the

assignment of the COP Agreement was integral to the sale and removing it from the sale would

adversely affect the terms of the sale—likely resulting in the reversal of the Sale Order.  The

Trustee has provided evidence that $1,916,707.77 of the sale proceeds have been distributed to

lienholders and other creditors of CWM.[59]  If the Sale Order were to be reversed, the Trustee

would be tasked with recovering the funds already distributed to creditors.  This would

necessarily cause a hardship to those non-party creditors who would be required to re-pay the

amount of the proceeds each has received.

Though not necessarily third-party creditors, it is this factor that caused Rhino and Castle

Valley to intervene in the instant Motion.  As interested parties—the purchasers of the CWM

mining assets—Rhino and Castle Valley are concerned with how this Court's ruling may affect

property they have rightfully purchased.  After expending considerable sums of money and time

---

[58]*Paige*, 584 F.3d at 1343 (quoting *Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 542 F.3d 131, 136 (5th Cir. 2008) ("The ultimate question to be decided is whether the Court can grant relief without undermining the plan and, thereby, affecting third parties.")).

[59]*See* Docket No. 17 Ex. 10, at 2.

in reliance on the Sale Order, Rhino and Castle Valley are compelled to defend the assets they purchased.

The Court's foremost concern in this appeal is for the rights of Rhino, Castle Valley, and those third-party creditors who have received payment from the proceeds of the sale.  Because these parties stand to lose the value of their exchange through this appeal, this factor weighs in favor of finding this appeal equitably moot.

> d.       PUBLIC POLICY

"This factor 'reflects a court's concern for striking the proper balance between the equitable considerations of finality and good faith reliance on a judgment and the competing interests that underlie the right of a party to seek review of a bankruptcy court order adversely affecting him.'"[60]

> In [*Paige*], [the Tenth Circuit] acknowledged that "completed acts in accordance with an unstayed order of the bankruptcy court must not thereafter be routinely vulnerable to nullification if a plan of reorganization is to succeed."  And [further] found it "equally important that a court not reverse a bankruptcy plan if an appellate reversal . . . would create a nightmarish situation for the bankruptcy court on remand and make reconstructive relief extremely improbable."  But [the Tenth Circuit] also considered the seriousness of the appeal allegations as a "countervailing concern" that could weigh against a determination of equitable mootness.[61]

As has been discussed previously, Rhino, Castle Valley, and CWM's creditors have an interest in the finality of the unstayed Sale Order.  They have exercised good faith reliance on the

---

[60]*Id.* at 1347 (quoting *First Union Real Estate Equity & Mortg. Inv. v. Club Assocs. (In re Club Assocs.)*, 956 F.2d 1065, 1069 (11th Cir. 1992)).

[61]*In re Centrix*, 394 F. App'x at 492 (quoting *Paige*, 584 F.3d at 1347).

Sale Order being a valid judgment of the bankruptcy court entitling them to the proceeds for which they have provided value or, in the case of the creditors, for which they are owed for past value provided.  While cognizant of COP's right to seek review of the bankruptcy court's orders—which, undoubtedly, have an effect on COP—here, the Court is persuaded that COP, in a delinquent fashion, is seeking a second day in court.

Furthermore, the issues raised in this appeal are not "troubling allegations" of bad faith dealings or a lack of disinterestedness on the part of the Trustee.[62]  The majority of issues raised by COP relate to the bankruptcy court's interpretation of the Continuous Operations Clause of the COP Agreement.  Allegations of faulty contract interpretation are not of themselves troubling allegations that "bring to light some issue that [speaks] to the integrity of the bankruptcy process."[63]  For these reasons, this factor weighs heavily in favor of finding this appeal equitably moot.

e.    IMPACT ON NEW REORGANIZATION

"The fifth factor a court should consider in determining whether an appeal is equitably moot is the impact of reversal upon the likelihood of a new, successful reorganization."[64]

The parties do not dispute that the Bear Canyon mine was the principal and most valuable asset of CWM's mining estate.  CWM's rights to the Bear Canyon mine arise from the COP

---

[62]*Paige*, 584 F.3d at 1347 ("[T]here are countervailing concerns that outweigh the public policy interest in finality of bankruptcy court decisions in this case.  [Appellant] raises troubling allegations of bad-faith dealings between the debtor . . . and the trustee, and of a lack of disinterestedness on the part of the trustee.").

[63]*Id*.

[64]*In re Centrix*, 394 F. App'x at 493.

Agreement.  If the Court were to adopt an interpretation of the Continuous Operations Clause of the COP Agreement that provided COP with unfettered discretion to allege a default, it is highly likely that the CWM estate would suffer a decline in value.  Thus, were the Court to grant COP the relief it seeks through this appeal, it is unlikely that the Trustee would be able to recuperate the same value from the estate through a new sale or restructuring of the existing sale.  For this reason, the Court finds that this factor weighs in favor of finding this appeal equitably moot.

f.      MERITS

"The final factor in evaluating whether an appeal is equitably moot involves a 'quick look at the merits of appellant's challenge to the plan' to determine if it is 'legally meritorious or equitably compelling.'"[65]

Movants assert that "COP's appeal of the February 2010 Order is close to frivolous."[66] COP does not rally any defense to counter this characterization.  Though without sufficient information to make a definite determination whether this appeal is meritorious, the Court would note that COP's claims do not appear to be substantively compelling.  Therefore, this factor weighs in favor of finding the appeal equitably moot.

g.      EQUITABLE MOOTNESS CONCLUSION

In sum, the Court finds that review of the above factors supports a finding that this appeal is equitably moot.

---

[65]*Id.* at 493-94.

[66]Docket No. 16, at 26.

III.  CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that the Trustee, Rhino, and Castle Valley's Joint Motion for Dismissal of

Appeal as Moot and Interlocutory (Docket No. 15) is GRANTED.  The Clerk of Court is directed

to close this case forthwith.

DATED   June 7, 2012.

BY THE COURT:

_____

TED STEWART
United States District Judge